1    Philip A. Bock (IL State Bar No. 6224502)
2    Daniel J. Cohen (IL State Bar No. 6212574)
3    Molly S. Gantman (IL State Bar No. 6320645)
4    134 N. LaSalle St., Ste. 1000
5    Chicago, IL 60602
6    service@classlawyers.com
7    (312)658-5516
8    Counsel for Plaintiffs

9

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF ARIZONA, TUCSON DIVISION

| | |
|---|---|
| In re Fed. R. Civ. P. 45 subpoena duces tecum issued to Digital Digital Messaging Solutions, Inc. <br><br> AMERICA'S HEALTH AND RESOURCE CENTER, LTD. and AFFILIATED HEALTH GROUP, LTD., Illinois corporations, individually and as the representatives of a class of similarly-situated persons, <br><br>        Plaintiffs, <br><br>        v. <br><br> ALCON LABORATORIES, INC., NOVARTIS PHARMACEUTICALS CORPORATION, and JOHN DOES 1-12, <br><br>        Defendants. | Underlying action pending in the United States District Court for the Northern District of Illinois, Eastern Division, No. 16-cv-4539, Hon. Thomas M. Durkin (Dist. Judge), and Hon. Young B. Kim (Mag. Judge), (the "primary court" or "issuing court"). <br><br>     Misc. Action No. _____ <br><br>     Hon. _____ <br><br> PLAINTIFFS' MOTION, AND MEMORANDUM IN SUPPORT THEREOF, FOR ORDER TRANSFERRING PLAINTIFFS' MOTION TO COMPEL DIRECTED TO THIRD-PARTY SUBPOENA DUCES TECUM RESPONDENT DIGITAL MESSAGING SOLUTIONS, INC. TO THE ISSUING COURT, OR, IN THE ALTERNATIVE, FOR AN ORDER GRANTING SAID MOTION TO COMPEL, FINDING DIGITAL MESSAGING SOLUTIONS, INC. IN CONTEMPT, AND AWARDING ALL COSTS, INCLUDING ATTORNEY'S FEES, INCURRED IN BRINGING THIS MOTION. |

DATED this 4 May 2018

     /s/  Molly S. Gantman
       Attorney for Plaintiff

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................... i

TABLE OF AUTHORITIES ..................................................................................... ii

SUMMARY OF RELIEF REQUESTED .................................................................. iii

I.   INTRODUCTION ............................................................................................ 1

II.  BACKGROUND ............................................................................................. 2

III. ARGUMENT ................................................................................................... 8

    A.  Transfer to the Northern District of Illinois is warranted. ........................ 8

    B.  DRL has waived any objection it may seek to interpose in
        opposition to Plaintiffs' SDT, and should be ordered to produce all
        responsive documents. ...................................................................... 11

    C.  DMS should be compelled to produce mirror images of all of its
        servers, hard drives, and databases that contain relevant and
        responsive documents, including the hard drive for the employee
        laptop that led to DMS's production of documents pertaining to 18
        of 63+ broadcasts. ............................................................................ 12

    D.  Plaintiffs are entitled to costs and fees incurred in bringing this
        motion. ............................................................................................ 15

IV. PRAYER FOR RELIEF .................................................................................. 17

CERTIFICATE OF SERVICE .............................................................................. 18

i

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page**

*Appleton Papers Inc. v. George A. Whiting Paper Co.*, No. 08-C-16, 2009 WL
2408898 (E.D. Wis. July 31, 2009) ........................................................... 12

*Applied Sys. v. Northern Ins. Co.*, No. 97-C-1565, 1997 WL 639235 (N.D. Ill.
Oct. 3, 1997) ................................................................................................ 11

*Brogren v. Pohlad*, No. 94-C-6301, 1994 WL 654917 (N.D. Ill. Nov. 10, 1994) .... 11, 12

*Lucas v. Gold Std. Banking, Inc.*, No. 13-CV-1524, 2017 WL 3394726 (N.D. Ill.
Aug. 8, 2017) (Kim, J.) ................................................................................ 11

*Martinez v. City of Avondale*, No. CV-12-1837-PHX-LOA, 2013 WL 5705291
(D. Ariz. Oct. 18, 2018) ............................................................................... 11

*OrthoAccel Technologies, Inc. v. Propoel Orthodontics LLC, et al.*, No. MC-16-
71-PHX-JJT, 2016 WL 6093367 (D. Ariz. Oct. 19, 2016) ....................... 9, 10

*Pennwalt Corp. v. Durand-Wayland, Inc.*, 708 F.2d 492 (9th Cir. 1983) ..................... 16

*United States S.E.C. v. Hyatt*, 621 F.3d 687 (7th Cir. 2010) ................................. 15, 16

*Whiteamire Clinic, P.A., Inc. v. Quill Corp.*, No 12-C-5490, 2013 WL 5348377
(N.D. Ill. Sept. 24, 2013) ............................................................................. 14

*Young v. City of Chicago*, No. 13-C-5651, 2017 WL 25170 (N.D. Ill. Jan. 3,
2017) ............................................................................................................. 11

**Statutes**

Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 ............................... 1

**Rules**

Fed. R. Civ. P. 45 (a) (2) ............................................................................................ 8

Fed. R. Civ. P. 45 (a) (2) (Advisory Committee Note to 1991 amendment) ................. 16

Fed. R. Civ. P. 45 (d) (3) ............................................................................................ 8

Fed. R. Civ. P. 45 (e) (2) (B) ...................................................................................... 8

Fed. R. Civ. P. 45 (f) ................................................................................................... 8

Fed. R. Civ. P. 45 (f) (Advisory Committee Note to 2013 amendment) ........................ 9

Fed. R. Civ. P. 45 (g) ............................................................................................. 8, 15

Fed. R. Civ. P. 45 (g) (Advisory Committee Note to 2013 amendment) ...................... 16

**Treatises**

9A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE
AND PROCEDURE § 2465 (3D ED. 2008) ...................................................... 15

## SUMMARY OF RELIEF REQUESTED

Plaintiffs America's Health and Resource Center, Ltd. and Affiliated Health Group, Ltd. (together, "Plaintiffs"), by counsel, pursuant to Fed. R. Civ. P. 37 and 45 (d) (2) (B) (i), move this Court to issue an Order transferring their motion to compel directed to third-party subpoena duces tecum ("SDT") respondent Digital Messaging Solutions, Inc. ("DMS") to the Northern District of Illinois, Eastern Division—*i.e.*, the venue in which the primary underlying action is pending (the "primary court" or "issuing court")—for hearing and resolution. In the alternative, if this Court denies transfer, Plaintiffs request an Order finding that DMS has waived objections to the SDT, compelling DMS to fully respond to and comply with the SDT, compelling DMS to produce a mirror image of its relevant server(s), hard drive(s) and devices—along with backups of same—used in connection with its "fax broadcasting" services, and requiring DMS to pay costs, including attorney's fees, incurred in bringing this motion.

## I.    INTRODUCTION

Plaintiffs move to compel compliance with the SDT served on DMS in connection with litigation pending in the primary court alleging that defendants Alcon Laboratories, Inc. and Novartis Pharmaceuticals Corporation ("Defendants") violated the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, by sending, or causing to be sent, unsolicited fax advertisements to Plaintiffs and a putative class of similarly situated persons (the "primary action"). Pursuant to Rule 45, this related motion must be filed in the court where compliance is required. Fed. R. Civ. P. 45 (d) (2) (B) (i), (d) (3), and (e) (2) (B). Rule 45 (f) provides authority for that court to transfer the motion to the court where the primary action is pending. Fed. R. Civ. P. 45 (f).

The SDT commands production of documents relevant to the claims and defenses raised by the parties in the primary action. DMS's position as to compliance with the SDT has ranged from complete denial of any involvement or possession of responsive documents, to producing fractions of the relevant and responsive documents known to be in its possession, custody or control, to offering its servers for mirror imaging so Plaintiffs may retrieve the relevant and responsive documents that DMS has failed to produce, to renewing its denial of any involvement or possession of responsive documents, and to recanting its original response to the SDT. DMS's non-compliance and apparent obstruction has necessitated the filing of this motion.

Plaintiffs request that the Court transfer this motion to the primary court pursuant to Fed. R. Civ. P. 45 (f). Counsel for DMS, William Hayes ("Hayes") has advised that DMS consents to transfer. In the event transfer is denied, Plaintiff request that the Court: (1) compel DMS to produce all relevant and responsive documents in its

1  possession, custody or control; (2) compel DMS to produce for mirror imaging its

2  relevant servers, back-up servers, hard drive(s), and devices—along with backups

3  thereof—used in connection with its fax broadcasting-related services; (3) find DMS in

4  contempt pursuant to Rule 45; (4) impose sanctions against DMS for its failure to make

5  a good faith effort to comply with the SDT; (5) impose sanctions against DMS for its

6  false and/or misleading statements made to evade compliance with the SDT; and (6)

7  award Plaintiffs costs, including attorney's fees, associated with bringing this motion.

8  ## II.    BACKGROUND

9  On 5/10/17, Defendants in the primary action disclosed DMS's involvement in the

10  subject fax marketing campaigns. *See* Summary of Plaintiffs' discovery efforts directed

11  to DMS, submitted herewith as Exhibit 1 at ¶ (a); Ex. 1-A (Defendant Alcon

12  Laboratories, Inc.'s second supplemental answers and objections to Plaintiffs' first set of

13  interrogatories) at int. no. 6. Between 5/24/17 and 6/6/17, DMS's registered agent evaded

14  personal service eight separate times at his Georgia-based law office, and failed to return

15  Plaintiffs' counsel's phone calls inquiring as to a more convenient location for service.

16  Ex. 1 at ¶ (b); Ex. 1-B (affidavit of nonservice on DMS); Ex. 1-C (declaration of Molly S.

17  Gantman) at ¶ 3. Plaintiffs' counsel then attempted to serve DMS's CEO, Daniel Horton,

18  at DMS's principle office in Tucson, Arizona, and again at Horton's home address in

19  Tucson, Arizona, with no success. Ex. 1 at ¶ (b); Ex. 1-C at ¶¶ 4-7. On 8/8/17, DMS's

20  CFO, Timothy Flynn, was personally served with the SDT in Novi, Michigan. Ex. 1-D.

21  In addition, on 8/9/17, substituted service was accomplished on the Georgia Secretary of

22  State. Ex. 1 at ¶ (c); Ex. 1-E. On 8/10/17, a copy of the SDT was served via overnight

23  mail on all known addresses associated with DMS and its officers. Ex. 1 at ¶ (d); Ex. 1-G.

2

DMS's compliance with the SDT was due on 9/4/17. Ex. 1 at ¶ (h); Ex. 1-G (email to Horton attaching the SDT and related documents served).

On 8/18/17, Horton contacted Plaintiffs' counsel and claimed that DMS had no responsive documents in its possession, custody or control, and had no involvement in Defendants' fax advertising activities. Ex. 1 at ¶¶ (e)-(i). On 9/7/2017, Horton's first-retained counsel reiterated Horton's claim in a letter expressly identified as DMS's response to the SDT. Ex. 1 at ¶¶ (g)-(i); Ex. 1-H. Nevertheless, DMS's response went on to identify "WestFax, Inc., Attn: Barry Allen, 9200 East Mineral Avenue, Suite 275, Centennial, CO 80112; Toll Free: 800-473-6208; Local: 383-299-9329; Fax: 303-229-9309; info@westfax.com" ("WFI") as the fax broadcaster involved in the fax advertising at issue. Ex. 1-H. Plaintiffs' counsel responded with a detailed explanation of the basis for their knowledge that DMS had documents responsive to the SDT. Ex. 1-I.

On 9/11/17, DMS, by its second counsel, produced 23 pages of documents that were "of the type that [would be] produced for the months requested in the [SDT]." Ex. 1 at ¶ (k); Ex. 1-J (email from DMS's second counsel attaching its first phase of production). That production included a "WestFax Purchase Journal" and a "PFN Sales Journal" that Horton compiled in response to the SDT pertaining to fax broadcasting activities undertaken on behalf of Defendants. Ex. 1-K; Ex. 1-L. The "PFN Sales Journal" revealed that DMS contracted with WestFax, Inc. ("WFI") to send fax broadcasts on behalf of "Alcon" relating to the following drugs: Durezol, Ilevro, Pataday, Tobradex, Travatan, Moxeza, AirOptix, Pazeo, and Ciprodex. Ex. 1 at ¶ (k); Ex. 1-L.

On 9/12/17, Plaintiffs' counsel asked DMS's counsel why the "Line Description" column of the "PFN Sales Journal" contained a significant number of details for entries

1    made on or after 8/31/16, but the same types of detail were omitted from the pre-August,

2    2016 entries. Ex. 1-M (email from Plaintiffs' counsel). DMS's counsel responded that the

3    reason for the discrepancy was that DMS did not preserve detailed records after an

4    invoice was paid. Ex. 1-N (9/14/17 letter from DMS's second counsel).

5           On 9/14/17, Plaintiffs' counsel received DMS's second production, consisting of

6    spreadsheets containing contact information, including phone numbers, for intended

7    recipients of 18 fax broadcasts advertising Defendants' products along with copies of

8    those advertisements (Group Exhibits 2-19), and one "example" of a WFI job summary

9    report and a WFI invoice to DMS (Group Exhibit 20), both dated 8/31/17. Ex. 1-N. DMS

10   represented that "this production fully meets the type of documents requested in the

11   [SDT]." *Id.* DMS produced no communications with any vendors related to Alcon fax

12   advertising, including communications with PFN Communications, Inc. ("PFN"), despite

13   the fact that PFN—the sub-vendor acting on behalf of Defendants who contracted with

14   DMS—had produced such communications. *See e.g.*, Ex. 1-O.

15          On 9/18/17, another SDT respondent, Contemporary Graphic Solutions ("CGS"),

16   produced more than 53,000 pages of documents. Ex. 1 at ¶ (n). That production contained

17   information sufficient to access folders containing thousands of responsive documents

18   hosted on file transfer protocol ("FTP") servers maintained by DMS. Group Exhibit 21. It

19   further revealed that DMS likely had email communications with D&R Lathian ("DRL"),

20   another third-party SDT respondent involved in Defendants' fax advertising activities. *Id.*

21   Those documents were not contained in DMS's previous productions, nor were they of

22   the "type" of documents contained in DMS's previous productions.

On 10/18/17, Plaintiffs' counsel notified DMS's counsel that there appeared to have been at least 63 fax broadcasts advertising Defendants' products, yet for 45 of those broadcasts, DMS had not produced responsive documents. Ex. 1-P (email exchange between Plaintiffs' counsel and DMS's second counsel). Plaintiffs' counsel also inquired as to why no documents from the FTP servers had been produced. *Id*. Plaintiffs' counsel and DMS's counsel spoke via telephone regarding same, and DMS's counsel stated that he would raise these issues with his client. On 10/19/17, Plaintiffs' counsel reminded DMS's counsel that in addition to the foregoing, relevant communications known to be in DMS's possession, custody or control had yet to be produced, and requested a status update no later than 10/27/17. *Id*.

On 10/26/17, DMS claimed Plaintiffs' access to the FTP servers was "unlawful[.]" *Id*. In spite of that accusation, DMS's counsel expressed his intent "to speak with [his] client and have it review its records for any non-privileged information." *Id*. In so stating, DMS's counsel revealed that DMS had communications with other involved third-parties that also had been intentionally withheld. *Id*. On 11/2/17, DMS supplemented its SDT production with a very small volume of documents, and represented that its compliance was now complete, notwithstanding that its production still did not include documents known to exist on DMS's FTP servers. Ex. 1-Q. It similarly omitted all communications, spreadsheets, advertisements, WestFax job summary reports, and WestFax invoices for any of the 60+ fax broadcasts in which DMS was involved.

On 11/16/17, Plaintiffs' counsel responded to DMS's "illegality" accusation, pointing out that CGS had the right to access the site, and so CGS obviously had the right to grant similar access to Plaintiffs. Ex. 1-R. Plaintiffs' counsel further identified

5

1   continuing deficiencies in DMS's SDT production compliance that had already been

2   identified in previous communications. *Id*. On 11/30/17, Plaintiffs' counsel

3   communicated a final attempt to secure DMS's full compliance with the SDT. Ex. 1-S

4   (letter from Plaintiffs' counsel). DMS's counsel responded by stating his belief that DMS

5   had provided everything in its possession responsive to the SDT, notwithstanding that

6   there were files on DMS's FTP servers, seen by Plaintiffs' counsel when accessing some

7   of those servers, that DMS had yet to produce. Ex. 1-T (email exchange). DMS's counsel

8   also offered to create and produce a copy of DMS's FTP and email servers, subject to

9   very broad and onerous restrictions, limitations and confidentiality requirements. *Id*.

10  Plaintiffs' counsel responded, noting that such an offer did not address all of the

11  deficiencies raised in Plaintiffs' counsel's numerous communications, and stating that it

12  was "difficult, if not impossible, to engage in a meaningful discussion with you when you

13  pick and choose what you respond to from our earlier communications." *Id*.

14      On 12/7/17, DMS's counsel responded, purporting to explain that DMS was only

15  able to produce documents relating to 18 out of 63 broadcasts because documents relating

16  to those 18 broadcasts had been located on the home computer of a DMS employee,

17  Cynthia Jaeger, and again making the offer to copy DMS's FTP and email servers,

18  subject to yet additional conditions. *Id*. On 1/19/18, Plaintiffs' counsel circled back with

19  DMS's counsel, asking to set up a call to discuss the logistics of the server-copying offer,

20  along with other outstanding issues. *Id*. On 1/22/18, Plaintiffs' counsel again requested a

21  call, and it was scheduled for 1/25/18. *Id*. The next day, culminating Plaintiffs' counsel's

22  longstanding efforts to secure compliance with a separate SDT previously served on WFI

23  (*i.e.*, the actual fax broadcaster), WFI's counsel, Hayes, sent emails denying that WFI had

any involvement in fax advertising any Alcon products, and extended that denial to DMS (*i.e.*, Hayes denied that DMS had any involvement in fax advertising any Alcon products), all of which was contrary to (1) DMS's original SDT response admitting that DMS and WFI were both involved in such fax advertising (Ex. 1-H), and (2) PFN's previous representation that it had contracted its obligations related to fax advertising of Alcon's products to DMS (Exhibit 22-Affidavit of PFN's president). Ex. 1-U (email exchange between Plaintiffs' counsel, DMS's second counsel, and Hayes). Plaintiffs' counsel then forwarded those communications with Hayes to DMS's second counsel. *Id*. On 1/24/18, DMS's second counsel communicated to Plaintiffs' counsel that he would no longer be representing DMS, that Hayes would be representing DMS (as well as WFI) in relation to the discovery disputes as to those vendors in the primary action, and that the previously-scheduled conference call was canceled accordingly. *Id*.

On 1/26/18, Plaintiffs' counsel received a declaration from PFN's president attesting to PFN's role in the fax advertising of Defendants' products, including that PFN had hired DMS to (1) match fax numbers to target lists, (2) arrange for a fax broadcaster to transmit the fax broadcasts, (3) receive from the fax broadcaster transmission logs for the broadcasts, and (4) make those transmission logs available to PFN and DRL (*i.e.*, Defendants' primary vendor for marketing, including fax advertising). Ex. 22.

Finally, on 1/30/18, Hayes denied that he had been retained to represent DMS in connection with with the SDT served on it. Exhibit 23. Plaintiffs reached out to Horton, DMS's CEO, inquiring whether he, on behalf of DMS, would oppose the present motion. Exhibit 24. He insisted that DMS would be represented by Hayes, and both he and Hayes stated that they would be reserving their position on the present motion until after it was

7

1   filed. <u>Exhibit 25</u>. Finally, on 2/6/18, Hayes confirmed his representation of DMS,

2   reiterated DMS's denial of any involvement or possession of responsive documents, but

3   never once offered an explanation of how the same can be true in light of the documents

4   DMS had already produced (*see e.g.*, Exs. 1-H; 1-J; 1-O; Grp. Exs. 2-22). <u>Exhibit 26</u>.

5   DMS's shifting positions, failure to fully comply with the SDT, and apparent obstruction

6   has necessitated the filing of this motion.

7                                    **III.    ARGUMENT**

8   **A.    Transfer to the Northern District of Illinois is warranted.**

9           Rule 45 requires that a subpoena "issue from the court where the action is

10  pending." Fed. R. Civ. P. 45 (a) (2). But subpoena-related motions must be filed in the

11  court where compliance is required. Fed. R. Civ. P. 45 (d) (2) (B), (d) (3), and (e) (2) (B).

12  "When the court where compliance is required did not issue the subpoena, it may transfer

13  a motion under [Rule 45] to the issuing court if the person subject to the subpoena

14  consents or if the court finds exceptional circumstances." Fed. R. Civ. P. 45 (f). In the

15  event of such transfer, and "[t]o enforce its order [on the motion], the issuing court may

16  transfer the order to the court where the motion was made." *Id*. The court that decides the

17  motion may hold in contempt a non-compliant respondent. Fed. R. Civ. P. 45 (g).

18          In this case, DMS has consented to transferring consideration of Plaintiffs' motion

19  to compel DMS's SDT compliance to the primary court. Further, DMS's counsel has

20  taken the position in a number of TCPA class actions that transfer to the primary court is

21  appropriate, and transfer is subsequently granted.[1] But regardless of consent, exceptional

---

[1]         *See e.g. Comprehensive Health Care Sys. v. M3 Corp.*, No. 17-mc-00126-CMA,
WFI Opp'n to Pls.' Mot., ECF 12 at p. 1 (D.C. Colo.); *America's Health and Resource Center, Ltd. et al. v. Alcon Laboratories, Inc. et al.*, No. 17-mc-00193-WYD, Stipulation

circumstances exist justifying transfer to the primary court. The Advisory Committee sheds light on the type of "exceptional circumstances" contemplated by this rule, and offers guidance as to how to minimize burden on nonparties:

> [absent] consent, the court may transfer in exceptional circumstances .... The prime concern should be avoiding burdens on local nonparties subject to subpoenas .... however, <u>transfer may be warranted in order to avoid disrupting the issuing court's management of the underlying litigation, as when that court has already ruled on issues presented by the motion or the same issues are likely to arise in discovery in many districts.</u> Transfer is appropriate only if such interests outweigh the interests of the nonparty served with the subpoena in obtaining local resolution of the motion.
>
> \*      \*      \*
>
> If the motion is transferred, judges are encouraged to permit telecommunications methods to minimize the burden a motion to transfer imposes on nonparties .... The rule provides that if these attorneys are authorized to practice in the court where the motion is made, they may file papers and appear in the court in which the action is pending in relation to the motion as officers of that court.

Fed. R. Civ. P. 45 (f) (Advisory Committee Note to 2013 amendment) (emphasis added).

When considering this issue, judges in the U.S. District Court for the District of Arizona generally find in favor of transfer where interests of judicial economy and avoiding inconsistent results outweigh any undue burden resulting from transfer. For example, in *OrthoAccel Technologies, Inc. v. Propoel Orthodontics LLC, et al.*, No. MC-16-71-PHX-JJT, 2016 WL 6093367 (D. Ariz. Oct. 19, 2016), the court found in favor of transfer where resolution of the motion would require "investigation, education, and investment that would otherwise be unnecessary were they decided in the [issuing court] in conjunction with the underlying action." *Id.* at \*2. The court reasoned that because (1)

---

to Pls.' Mot. to Transfer, ECF 10 at p. 2, Order transferring Pls.' Mot. to Compel, ECF 12 (D.C. Colo.).

1   resolution of the motion would "require consideration and interpretation of Orders issued

2   by the [issuing] court" and (2) the issuing court had "an understanding of the factual

3   predicates that underlie the information sought by the [Rule 45 subpoena] and whether

4   such information falls within the purview of the current claim and its Orders[,]"even if it

5   spent all the resources necessary to get up to speed with the issues surrounding the

6   motion, "the risk of inconsistent rulings in each jurisdiction … [was] high." *Id*. The court

7   further found the potential burden on the subpoena respondent low, as its attorney would

8   not be required to make a personal appearance in the issuing court to participate in

9   proceedings surrounding the motion. *Id.* Therefore, the court ruled that "exceptional

10  circumstances" existed such that transfer to the issuing court was warranted.

11      In this case, the issuing court has already made several rulings on the relevant and

12  permissible scope of discovery from third party subpoena respondents like DMS (ECF

13  74; ECF 105), will continue to address discovery issues as they arise (ECF 80-Order

14  referring action to Magistrate Judge Kim for discovery supervision and dispute

15  resolution), and is fully aware of the factual predicates that underlie the information

16  sought by the SDT. The issuing court would not need to perform the level of

17  investigation, education, or investment that this Court would have to undertake in order

18  to determine whether the information sought in the SDT falls within the purview of the

19  underlying action and the issuing court's orders. DMS has consented to transfer, but even

20  if DMS were to change its position, telecommunication methods and remote filing will

21  mitigate any burden on DMS resulting from transfer. Should this Court refuse transfer, it

22  would have to expend a tremendous amount of resources just to get "up to speed" on the

23  issues that the issuing court has been considering for months, and would then have to

1  educate itself as to the rulings made by the issuing court to mitigate against the likelihood

2  of inconsistent rulings. Under these circumstances, exceptional circumstances exist to

3  justify transfer.

4  **B.**   **DRL has waived any objection it may seek to interpose in opposition to**
5            **Plaintiffs' SDT, and should be ordered to produce all responsive documents.**

6            Rule 45 requires that an entity commanded to produce documents pursuant to SDT

7  serve written objections, if any, "before the earlier of the time specified for compliance or

8  14 days after the subpoena is served." Fed. R. Civ. P. 45 (d) (2) (B). *See also Young v.*

9  *City of Chicago*, No. 13-C-5651, 2017 WL 25170, at *8 (N.D. Ill. Jan. 3, 2017) (this

10 requirement ensures that "discovery does not become a game") (internal citations

11 omitted). Withholding materials without such notice runs contrary to the Federal Rules of

12 Civil Procedure, subjects a party to sanctions under Fed. R. Civ. P. 37 (b) (2), and

13 justifies waiver of the privilege or protection. *Applied Sys. v. Northern Ins. Co.*, No. 97-

14 C-1565, 1997 WL 639235, at *2 (N.D. Ill. Oct. 3, 1997); *Martinez v. City of Avondale*,

15 No. CV-12-1837-PHX-LOA, 2013 WL 5705291, at *3 (D. Ariz. Oct. 18, 2018) (stating

16 that a "nonparty's failure to timely make objections to a Rule 45 subpoena … generally

17 requires the court to find that any objections have been waived.") (internal citations

18 omitted). Evidence of "foot-dragging or a cavalier attitude towards following court orders

19 and the discovery rules supports finding waiver." *Lucas v. Gold Std. Banking, Inc.*, No.

20 13-CV-1524, 2017 WL 3394726, at *2 (N.D. Ill. Aug. 8, 2017) (internal citations

21 omitted). The failure to object to a discovery request in a timely manner justifies waiver

22 of the objection. *Applied Sys.*, 1997 WL 639235, at *2. (waiver justified after two-month

23 delay); *Brogren v. Pohlad*, No. 94-C-6301, 1994 WL 654917, at *1-2 (N.D. Ill. Nov. 10,

24 1994) ("*Brogen*") (same); *Appleton Papers Inc. v. George A. Whiting Paper Co.*, No. 08-

1    C-16, 2009 WL 2408898, at *1-2 (E.D. Wis. July 31, 2009) ("*Appleton Papers*") (waiver

2    justified after two-week delay).

3         In *Brogren*, plaintiffs served a non-party with a SDT, and the recipient waited

4    more than two months before serving written objections. *Brogen*, 1997 WL 639235, at

5    *1. The court collected cases across numerous circuits in support of its determination that

6    the third-party SDT respondent, by failing to lodge written objections within the 14-day

7    window of time provided under Fed. R. Civ. P. 45, had waived those objections. *Id*.

8    Similarly, in *Appleton Papers*, "the first inkling of an objection" to the plaintiffs' SDT

9    came roughly one month after the SDT was served. *Appleton Papers*, 2009 WL 2408898,

10   at *1-2. Therefore, the court held all objections waived. *Id*.

11        These cases are analogous to the present case in that DMS failed to lodge any

12   objections within the 14-day window of time provided under Fed. R. Civ. P. 45. Because

13   of DMS's failure to make any timely objections to the SDT this Court should find that

14   DMS's objections have been waived, and order DMS to fully comply with the SDT.

15   **C.    DMS should be compelled to produce mirror images of all of its servers, hard**
16   **drives, and databases that contain relevant and responsive documents,**
17   **including the hard drive for the employee laptop that led to DMS's**
18   **production of documents pertaining to 18 of 63+ broadcasts.**

19        The SDT commands production of fax advertisements intended for distribution,

20   lists of intended recipients ("target lists") including fax numbers, detailed delivery reports

21   ("transmission logs"), as well as any documents or data relating to any fax advertisements

22   that were returned by a recipient of same for the purpose of either opting out of fax

23   advertisements, or responding to the advertised materials.  *See* Ex. G at request nos. 6-13.

24   DMS is the only one of 20 SDT respondents in this case that is believed to have

25   possession, custody, and control of all of this evidence for each of the 63+ fax broadcasts

12

1    at issue in this litigation. And yet, it has produced only a fraction of what is reasonably

2    believed to be stored on its servers and hard drives, and even then only after months of

3    resistance and false representations.

4         This belief is premised upon not only DMS's partial SDT compliance (*see e.g.*,

5    Exs. 1-H; 1-J; 1-O; Grp. Exs. 2-22), but also upon DMS's public assertions regarding its

6    services. For example, DMS boasts that its fax broadcasting service provides the "fastest

7    transmission" of its customers' faxes, is capable of sending large volumes of "sends" at

8    "Wholesale pricing," and includes, *inter alia*, "Merge capabilities," "Best Result

9    Returns," and "Detailed deliver reporting." Exhibit 27, PDF printout of the "Fax

10   Broadcasting" section of DMS's website, www.dmsgs.com, accessed on May 1, 2018.

11   *But see* Hayes' 5/1/18 representation that DMS "does not fax." Exhibit 28. The "Detailed

12   deliver reporting," for example, describes the transmission logs Plaintiffs seek. DMS

13   further represents that it makes available to its customers "Dedicated EConnect servers"

14   with volumes starting at 30 million messages per month. Exhibit 29, PDF printout of the

15   "Pricing" section of DMS's website, www.dmsgs.com, accessed on May 1, 2018. Based

16   on DMS's known involvement with the advertisements at issue, including (but not

17   limited to) making available FTP servers on which advertising messages were stored and

18   accessed by other third-party facilitators of Defendants' fax advertising activities, it is

19   likely that the "EConnect servers" DMS advertises takes the form of the FTP servers

20   known to store relevant and responsive documents. It is also equally likely that DMS

21   would not destroy records contained on such servers absent a paying customer's

22   instruction to do so. Communications giving such instructions would similarly be

23   responsive to the SDT. Ex. G at request nos. 8, 12, 14, and 18.

1        This information is undeniably relevant to class certification, namely, the size of

2    the class, the identity of class members, and the number of times Defendants'

3    advertisements were sent to those class members in violation of the TCPA during the

4    relevant time period. *See Whiteamire Clinic, P.A., Inc. v. Quill Corp.*, No 12-C-5490,

5    2013 WL 5348377, at *3 (N.D. Ill. Sept. 24, 2013) (in TCPA fax advertising cases,

6    electronic data on class members is relevant to "numerosity, commonality, and

7    typicality"). And, as discussed in section B *supra*, any objection DMS might have to

8    Plaintiffs' mirror imaging request (Ex. 1-G at request no. 16) was waived as of 9/4/17.

9    Therefore, DMS has no basis to refuse production of same.

10        Mirror images are required because DMS simply cannot be trusted to produce all

11    responsive materials in its possession, custody or control. When faced with clear

12    evidence that Plaintiffs were aware of the contents of numerous FTP servers, DMS

13    produced only a fraction of such contents, from only a fraction of relevant FTP servers,

14    and then represented that compliance was complete. Further, it appears as if DMS deleted

15    data from the FTP sites set up to house fax advertising materials relating to the three

16    drugs advertised to the named Plaintiffs in the primary action. Given DMS's repeated

17    misrepresentations, shifting positions, and mysterious gaps in the documents that have

18    been produced to Plaintiffs, anything short of mirror imaging would deprive Plaintiffs of

19    relevant and responsive evidence known to be in DMS's possession, custody or control.

20        Virtually no burden on DMS would result from compelling DMS to allow

21    Plaintiffs to take mirror images of DMS's servers, hard drives, databases and backups of

22    same. Indeed, DMS's former counsel acknowledged that in December of 2017 when it

23    entered into negotiations to produce the same. Now that DMS is under new

14

1   representation, it is not only denying Plaintiffs' access to the relevant and responsive

2   evidence known to be in DMS's possession, custody or control, but it is denying any

3   involvement in any of the fax broadcasts at issue in this litigation. Under these

4   circumstances, mirror imaging is necessary. *See Whiteamire*, 2013 WL 5348377 at *5

5   (plaintiff entitled to inspect server and hard drives to "determine for itself" the veracity of

6   a discovery respondent's assertion that electronic data on its servers and hard drives did

7   not contain information identifying fax messages received by class members).

8           **D.      Plaintiffs are entitled to costs and fees incurred in bringing this motion.**

9           Rule 45 (g) states that the court "may hold in contempt a person who, having been

10  served, fails without adequate excuse to obey the subpoena or an order related to it." Fed.

11  R. Civ. P. 45 (g). "To prevail on a request for a contempt finding, the moving party must

12  establish by clear and convincing evidence that (1) a court order sets forth an

13  unambiguous command, (2) the alleged contemnor violated that command, (3) the

14  violation was significant, meaning the alleged contemnor did not substantially comply

15  with the order, and (4) the alleged contemnor failed to make a reasonable and diligent

16  effort to comply." *United States S.E.C. v. Hyatt*, 621 F.3d 687, 692 (7th Cir. 2010).

17          While a district judge may normally preface a contempt citation with an order

18  directing either compliance with the subpoena or a showing of an excuse for

19  noncompliance, the "Federal Rules of Civil Procedure declined to incorporate this

20  burdensome procedure into the modern procedural code." *Hyatt*, at 694-95 *citing* 9A

21  CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND

22  PROCEDURE § 2465 (3D ED. 2008). So long as the notice and motion provide adequate

23  notice that the movant will ask for a finding of contempt at the initial hearing, due

15

1    process is satisfied and an intervening court order compelling compliance is not required

2    before a party may move for contempt. *Id.* at 694 (vacating finding of contempt because

3    the SEC's notice and motion for order to show cause gave notice *only* that the court

4    would be asked to issue a show-cause order on the date of the hearing, *not* that it would

5    immediately take up the merits of the contempt issue) (emphasis in original).

6          "[D]efiance of a subpoena is [] an act in defiance of a court order and exposes the

7    defiant witness to contempt sanctions." Fed. R. Civ. P. 45 (a) (2) (Advisory Committee

8    Note to 1991 amendment). *Accord* Fed. R. Civ. P. 45 (g) (Advisory Committee Note to

9    2013 amendment) ("[s]ubdivision (g) carries forward the authority of former subdivision

10   (e) to punish disobedience of subpoenas as contempt. It is amended to make clear that, in

11   the event of transfer of a subpoena-related motion, such disobedience constitutes

12   contempt of both the court where compliance is required under Rule 45(c) and the court

13   where the action is pending"). The limited appellate case law that does exist on this issue

14   comports with this understanding. *Hyatt*, 621 F.3d at 693 *citing Pennwalt Corp. v.*

15   *Durand-Wayland, Inc.*, 708 F.2d 492, 494 n. 5 (9th Cir. 1983) ("a subpoena duces tecum

16   is itself a court order, and noncompliance may warrant contempt sanctions," but noting

17   that when the person subpoenaed objects in writing, "the party seeking discovery must

18   obtain a court order directing compliance" before contempt will be available).

19         In this case, the SDT sets forth unambiguous requests to produce documents

20   related to the transmission of faxes involved in the underlying litigation by 9/4/17. On

21   9/7/17, DMS's first attorney sent a letter serving as DMS's response to the SDT, made no

22   objections to the SDT, denied any relevant involvement or possession, custody or control

23   of any responsive documents, and pointed the finger at WestFax.  Then DMS's second

16

1    attorney produced a fraction of the relevant and responsive documents known to be in

2    DMS's possession, custody and control, promised that the same were "of the type" that

3    DMS would eventually produce for all broadcasts occurring during the relevant time

4    period, failed to supplement that production, deflected and specifically hindered Plaintiffs

5    counsel's efforts to obtain responsive information, lied about the documents in its

6    possession, custody or control, and ultimately recanted its original response as to

7    WestFax. DMS's efforts to "substantially comply" with the SDT were in no way

8    "reasonable and diligent;" rather, they were obstructive and misleading. DMS's foot-

9    dragging and intentional misrepresentations have caused unjustified delays, wasted the

10   valuable time and resources of multiple courts, and forced Plaintiffs to incur further

11   expense, including but not limited to the filing of this motion. Under these circumstances,

12   an order finding DMS in contempt pursuant to Rule 45 (g) and Rule 37, and awarding

13   Plaintiffs the costs and fees associated with bringing the present motion, is appropriate.

14                              **IV.    PRAYER FOR RELIEF**

15            WHEREFORE, Plaintiffs pray this Honorable Court transfer this motion to the

16   Northern District of Illinois, Eastern Division for merits disposition, or in the alternative,

17   grant the instant motion, order the relief requested, including costs, and such further relief

18   as the Court may deem just and proper.

Dated: May 4, 2018                          Respectfully Submitted,

                                            By: /s/ Molly S. Gantman
                                            Phillip A. Bock
                                            Daniel J. Cohen
                                            Molly Gantman
                                            BOCK, HATCH, LEWIS AND OPPENHEIM, LLC
                                            134 N. La Salle St., Suite 1000
                                            Chicago, IL 60602
                                            (312)658-5500; service@classlawyers.com
                                            17

**CERTIFICATE OF SERVICE**

   I hereby certify that on this day, I served the foregoing motion and exhibits via electronic mail on the following:

   *Attorney for Defendants:*

     Kyle Flynn (flynnk@gtlaw.com)
     Greg Ostfeld (ostfeldg@gtlaw.com)
     GREENBERG TRAURIG, LLP
     77 W. Wacker Drive, Suite 3100
     Chicago, IL 60601

   I further certify that on this day, I served the foregoing motion and public exhibits via electronic mail on the following:

   *Attorney for Digital Messaging Solutions, Inc.*

     William B. Hayes (sqhayes@aol.com)
     257 Jackson St.
     Denver, CO 80206

             /s/ *Molly S. Gantman*

18